IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CASTLETON COMMODITIES SHIPPING CO. PTE. LTD., | § § § | |
| Plaintiff, | § § | |
| vs. | § § | Case 4:16-cv-01472 *Admiralty* |
| HSL SHIPPING & LOGISTICS (NA) INC. and HUDSON SHIPPING LINES, INC. (LIBERIA), | § § § § | |
| Defendants. | § § | |

**CASTLETON'S SUR-REPLY IN OPPOSITION TO
HSL'S AND HSL LIBERIA'S MOTION TO VACATE AND DISMISS
FOR LACK OF SUBJECT MATTER JURISDICTION**

Plaintiff Castleton Commodities Shipping Co. Pte. Ltd. respectfully submits this Sur-Reply in Opposition to the Motions to Vacate and Dismiss for Lack of Subject Matter Jurisdiction [Dkts. 31 & 32] filed by Defendants HSL Shipping & Logistics (NA) Inc. ("HSL Shipping" or "HSL") and Hudson Shipping Lines, Inc. (Liberia) ("HSL Liberia") (collectively, the "Hudson Defendants".)[1] Specifically, Castleton files this sur-reply to submit deposition testimony which supports its response to HSL Shipping's and HSL Liberia's Motions to Dismiss (Castleton's "Response"). *See* Castleton's Response [Dkt. 42]. Because it is Castleton's position that HSL Liberia is mere alter ego of HSL Shipping, and both Motions raise nearly identical points of law and fact, Castleton files this single Sur-Reply in opposition to both Motions, which the Court should deny because the contracts at issue are plainly maritime in nature and support the Court' exercise of its original admiralty jurisdiction.

---

[1] HSL changed its name from "Hudson Shipping Lines, Inc." on or about February 29, 2016 although, upon information and belief, it continues to do business under the generic name of "Hudson Shipping Lines," which creates confusion and blurs the distinction between HSL Shipping and HSL Liberia.

## FACTUAL AND PROCEDURAL BACKGROUND

This case involves HSL's breach of two bareboat Charter Party agreements, both dated April 11, 2014 (the "Charter Parties"). The Charter Parties were formed for the chartering and eventual purchase of two new-build dry bulk vessels: the "*Loch Ness*" and the "*Loch Nevis*" (collectively, the "Vessels"). Under the Charter Parties, Castleton agreed to charter (i.e., lease) the Vessels to HSL for between three and seven years, and then to sell HSL the ships at the end of the mandatory chartering period.

HSL refused to comply with its contractual obligation to deposit cash security into an escrow account, so Castleton brought an arbitration in London under the rules of the London Maritime Arbitration Association ("LMAA") to address HSL's breach. On May 10, 2016, the tribunal of three LMAA arbitrators issued a Partial Final Award which found HSL to be in repudiatory breach of the Charter Parties by failing to submit a required cash security. Compl. [Dkt. 1 at ¶ 9]. Between May 12 and May 19, 2016, Castleton diligently sought HSL's compliance with the Partial Final Award to no avail.  Accordingly, on May 19, 2016, Castleton terminated the Charter Parties and has brought a second LMAA arbitration to collect liquidated damages for HSL's breach of the Charter Parties.

Before bringing this Rule B attachment proceeding, Castleton filed a substantially similar case in the Eastern District of Louisiana styled *Castleton Commodities Shipping v. HSL Shipping*, Cause No. 16-6619 (the "Louisiana Rule B Proceeding"). Like in this case, HSL and HSL Liberia filed Motions to Dismiss the Louisiana Rule B Proceeding.[2]  As a part of the Louisiana Rule B Proceeding, Castleton took the deposition of Benjamin Malkin, the General Counsel of both the Hudson Defendants, and HSL took the deposition Keith Denholm, Castleton's Director of Dry Bulk Shipping. The transcripts of those depositions are attached as **Exhibits 1** and **2**, respectively.

---

[2] Indeed, HSL Liberia filed the *actual* Motion to Dismiss it filed in the Louisiana Rule B Proceeding. HSL Liberia's Motion to Dismiss. [Dkt. 31].

On August 19, 2016, HSL's Motion to Dismiss was granted in the Louisiana Suit—a copy of the Court's Order & Reasons is attached as **Exhibit 3**.  Castleton intends to file an appeal of the Court's dismissal of the Louisiana Suit.

## ARGUMENT

1.     **The deposition testimony in the Louisiana Suit confirms that the Charter Parties are maritime contracts.**

Both Mr. Denholm and Mr. Malkin's deposition testimony are clear that the Charter Parties are primarily bareboat charter party agreements under which HSL was to charter the Vessels and use them in maritime commerce.[3]

      A.     **The operable provisions of the Charter Parties relate to HSL's chartering of the Vessels.**

As the LMAA Tribunal found, HSL failed to pay Castleton the contractually required performance guarantee, thereby placing HSL in anticipatory breach of the Charter Parties. It is undisputed that HSL never exercised its option or obligation to purchase the Vessels and that those rights never arose.

Before its right to exercise the purchase option came into existence after three full years of chartering the Vessels, Mr. Malkin confirmed HSL intended to operate the vessels under the bareboat charters in maritime commerce:

> Q:     So how long was the chartering period under [the charter parties]?
> A:     Well, it was, I guess, a minimum of three years, a maximum of seven years.
> Q:     Based on your understanding, Hudson had no right to purchase these vessels until a minimum of three years of the charter period had passed; correct?
> A:     Correct.
> Q:     What did Hudson plan to do with the vessels during that three-year mandatory minimum charter period?

---

[3]  Both Parties agree that the Charter Parties are unambiguous and Castleton therefore submits that it is improper for the Court to consider any evidence which contradicts or varies the  contracts' plain language under the parol evidence rule. *See Corbitt v. Diamond M. Drilling Co.*, 654 F.2d 329, 332-33 (5th Cir. 1981) (under federal maritime law "a court may not look beyond the written language of the document to determine the intent of the parties unless the disputed contract provision is ambiguous.").   Because in this case the Court specifically requested the depositions, Castleton provides this briefing to focus on the testimony which addressed the contractual provisions at issue.

> A:     Oh I—I can't answer that.  Operate them.
> Q:     Operate them?  How so? … What were you going to use them for?
> A:     Transporting cargo.
>        …
> Q:     So you were going to use the vessels for at least three years in maritime commerce; isn't that right?
> A:     Most likely, yes.

Ex. 1, Malkin Dep. at 20:1-19, 20:24-21:2.

Mr. Malkin also confirmed that, unless and until such an option were exercised, the only

operable portions of the charter party were those covering the charter of the vessels, specifically

including HSL's obligation to pay charter hire for the use of the vessels under charter:

> Q:     Okay, what about Paragraph 3 [of the rider agreement] what does that deal with?
> A:     It seems it deals with payment of hire.
> Q:     Payment of hire for the charter of the vessels, correct?
> A:     Yes.
> Q:     That has nothing to do with the sale of the vessels, does it?
> A:     No.
> Q:     On Paragraph 4, Delivery of the vessel… it says that, "The vessel shall be delivered during the period April 1, 2016 to September 30, 2016."  Do you see that?
>        …
>        So was that vessel being delivered to Hudson under the terms of this Paragraph 4 at the beginning of the chartering period, correct?
> A:     Yes.
> Q:     So that actually deals with delivery for the charter of the vessel, not for its delivery for the ultimate purchase, correct?
> A:     When the vessel is delivered to at the beginning of this agreement for the purposes of this agreement.
> Q:     Right because at the beginning of this agreement, Hudson had to charter the vessel, correct?
> A:     Yeah.

Ex. 1, Malkin Dep. at 39:1-40:7.

Similarly, unless and until such an option were exercised, the only payments due from the

charterer were those relating to the charter of the vessels:

> Q:     So what are the expenses and costs of a bareboat charterer under this agreement? … And are those, in your experience the kind of normal expenses that the charterer of a bareboat-chartered vessel incurs?
> A:     Yes.
> Q:     That has nothing to do with the purchase either, right?  That's all about the charter?
> A:     Yes.

4

Ex. 1, Malkin Dep. at p. 41:9-21.


**B.     The charter-hire payments were not installments on the purchase price.**

HSL's basic argument is that the Charter Parties are really vessel sale and purchase contracts masquerading as a bareboat charter parties. But the plain language of the agreements, as well as the deposition testimony, confirms that the charter hire payments due under the bareboat charter parties were not a means to pay for the purchase of the vessel by installments. There were three components to the charter party price — as Mr. Denholm described it: "the charter hire, … the purchase option prices, and then ultimately the purchase obligation price at the end of the seventh year." Ex. 2, Denholm Depo. at 51:9-13. And although these three components were "all part and parcel of the charter," they were separate from one another. *Id.* at 51:17-18.

Most importantly, the charter hire was not an installment of the purchase price. Mr. Denholm was clear that, although some hire purchase agreements allowed for the hire paid to be credited against the ultimate purchase price, that was not the case in this instance. "The hire does not contribute to the purchase." *Id.* 55:1-9. As Mr. Denholm testified: "The hire was pure hire, it was just charter hire. There was no credit in the purchase price figure for hire already having been paid. *Id.* at 52:4-7.

Unlike a "bareboat hire purchase agreement" in which, as Mr. Denholm put it, "the hire is linked into the final purchase price," the bareboat charter parties in this case did not provide that the hire would be credited or applied to the purchase price and the agreements were not "hire purchase agreements." *Id.* at 55:10-23.

Mr. Denholm also clarified the misconception and mischaracterization of HSL's counsel:

Q:     Isn't it a true statement that the whole charter obligation is really a way to spread out the payments for an ultimate purchase?
A:     No.
Q:     No, it's not?

5

A:     No.  You're going after the hire purchase, again, and that's not the case here.  This was a charter agreement where they got very competitively priced daily time charter hire, based on the market at that particularly point in time.  It was a discounted rate to the market.

Q:     With an obligation to purchase?

A:     Yes.

Q:     So that's my point: There's an obligation to purchase.  And so if you're paying higher payments, it spreads out whatever the ultimate purchase price is going to be; correct?
       …

A:     My answer to that is there's two—two components here.

Q:     Yes.

A:     One is the daily time charter or daily bareboat hire.  And which is completely separate is the purchase price and the obligation price.  The hire does not contribute to the purchase price.

Q:     Fair enough.

Ex. 2, Denholm Depo. at 78:19-82:17.

Finally, Mr. Malkin and HSL's counsel tried to twist the plain language of Rider Clause 12 of the Charter Parties, in which HSL agreed to pay $3.3 million per Vessel to "purchase the deal" into testimony that suggested — inaccurately — that this amount was a "down payment" which would be applied to the ultimate purchase price. Ex. 1, Malkin Dep. at 38:7-:16. When asked to confirm whether the Charter Parties actually contained such a provision, Mr. Malkin conceded that they did not:

Q:     Where does it say that [the $3.3 million would be applied to the purchase price] in the agreement?  I'm having a hard time finding that provision.

A:     It doesn't.  It doesn't say it was for the purchase of this – it doesn't say it in this paragraph."

Ex. 1, Malkin Dep. at 43:19-24.

**C.     The Parties intended that the Charter Parties were bareboat charters.**

It is undisputed that the Charter Parties are written on a standard charter code form the "Barecon 2001" issued by the Baltic and International Maritime Council. As Mr. Denholm testified, in 2013, Castleton was approached by KN Maritime — the ship owning arm of Shin Kurishima Shipyards in Japan — about "the prospect of chartering two vessels." Ex. 2, Denholm Depo. at 27:21-28:3. Castleton was never interested in owning the vessels. *Id.* at 32:24-33:6.

Subsequently, HSL Shipping was introduced to Castleton through DVB Bank because HSL Shipping "expressed an interest to have access to the Japanese charter market." *Id.* at 27:11-20. Initially, Castleton had not considered sub-chartering the vessels, but Mr. Denholm decided to enter into discussions with HSL and other potential charterers "to satisfy my management that [he] was de-risking the charters," that is, managing the transaction to account for potential "market fluctuations." *Id.* at 28:4- 29:22; 33:18-25; 34:18-22.

Initially, Castleton discussed with HSL an arrangement that would be a sub-time charter with options to purchase the vessels, but, to bring the daily hire down, Mr. Denholm proposed to HSL that they consider a bareboat charter arrangement. *Id.* at 31:3-16; 32:12-23. A very experienced executive in the shipping business, Mr. Denholm explained what is meant by a "bareboat charter":

> Q:   Okay.  What is a bareboat lease obligation?
> A:   Bareboat -- you've two forms of charter, a time charter and bareboat charter. A time charter, the ship comes with all of the technical management, crewing included.  A bareboat is a charter where you do not -- where you have to provide the technical management yourself. Sometimes people prefer to do the bareboat charter, because they view it as they can do it -- they can obtain technical management at a more competitive price, thereby bringing down their break-even cost.

*Id.* at 18:25-19:15.

As Mr. Denholm testified, "For all intents and purposes, you, as a bareboat charterer, you are operating as if you were the owner." *Id.* at 42:9-12. Mr. Malkin, HSL's representative who was principally involved in the negotiation of the charters, had the same view as to the difference between time and bareboat charters. Ex. 1, Malkin Depo. at 19:1-12.

HSL never asked to be placed in contact with the owners of the vessels in order for HSL to purchase the vessels. Ex. 2, Denholm Depo at 37:3-8. At first, the bareboat charter was to include an option to purchase the vessels. *Id.* at 31:17-32:6. It was the owners of the vessels who wanted to include a purchase obligation, not HSL. As Mr. Denholm testified:

> Q:   Right.  And passing it down to the line to a company that you knew, HSL, that wanted to purchase these ships?

> …
>
> A:      HSL wanted to charter these ships.  Initially, the discussion with HSL was actually time charter with options.  But I changed it as I stated before to try and get the hire down to changing it to a bareboat.
>
> Q:      So did you not know that HSL wanted to purchase these ships?
>
> A:      They initially wanted the option to purchase the ships.  It was the owners that  insisted that it be a purchase obligation, the owners being KN Maritime.

 Ex. 2, Denholm Depo at 43:1-17.

At all times, As Mr. Denholm testified, the parties understood the agreements to be charter

parties, not purchase contracts:

> Q:      So this whole bareboat charter arrangement ultimately was a purchase agreement at the end of the day?
>
> A:      No.
>
> …
>
> A:      A bareboat charter is exactly what it is, it's a charter.
>
> Q:      Really?  A lease bareboat charter is a charter?
>
> …
>
> A:      The BARECON charter party is on the printed form.  It's a charter party.  It's a –
>
> Q:      I know it very well.
>
> A:      It's a charter party.  I don't know how else you would describe that document.

*Id.* at 43:1-44:11.

Indeed, DVB Bank did not receive a commission based on the charters being sales contracts.

Mr. Denholm cleared up this misconception in his testimony:

> Q:      Did DVB earn a commission off this sale, off of this deal?
>
> A:      They got a flat fee from Hudson.
>
> Q:      How do you know about that?
>
> A:      Because it was disclosed up front between all parties.
>
> Q:      And that was for the purchase of these two vessels; correct?
>
> A:      It was for the charter.

*Id.* at 44:18-45:1.

In the end, the bareboat charters were precisely what they appeared to be: charter parties that

contained an option and obligation to purchase the vessel. As Mr. Denholm testified:

> A:      My testimony is it is a charter agreement with a purchase, with purchase options built in and ultimately, at the end, a purchase obligation.
>
> Q:      What is the difference, in your mind, between an obligation and an option?
>
> A:      One, you don't have to exercise and one, you do.

Q:     One, you don't have a choice you have to purchase, correct?
A:     Yeah.
       …
       I will repeat that it is a charter agreement with options and an obligation built into it.

   *Id.* at 52:16-53:24.


## CONCLUSION

For these reasons, Castleton respectfully submits that the Charter Parties are maritime contacts

under their plain language as confirmed by the deposition testimony.

Dated: August 23, 2016                    Respectfully submitted,

                                          *By: /s/ Christopher Johnsen*
                                          CHRISTOPHER JOHNSEN
                                          Texas Bar No. 24072169
                                          S.D. Admission No. 1067432
                                          HOLLAND & KNIGHT LLP
                                          1100 Louisiana Street, Suite 4300
                                          Houston, TX 77002
                                          Phone: (713) 244-6878
                                          Email: Chris.Johnsen@hklaw.com
                                          Attorneys for Plaintiff Castleton Commodities
                                          Shipping Co. Pte. Ltd.

                                          and

                                          THOMAS D. LELAND
                                          Holland & Knight, LLP
                                          633 Seventeenth Street, Suite 2300
                                          Denver, Colorado 80202
                                          Telephone (303) 303-974-6660
                                          Facsimile (303) 974-6659
                                          E-mail: thomas.leland@hklaw.com
                                          (*pro hac vice*)

                                          and

                                          PATRICK F. LENNON
                                          KEVIN J. LENNON
                                          LENNON, MURPHY & PHILLIPS, LLC
                                          The GrayBar Building
                                          420 Lexington Avenue, Suite 300
                                          New York, New York 10170
                                          Telephone: (212) 490-6050

Facsimile: (212) 490-6070
E-mail: pfl@lmplaw.net
E-mail: kjl@lmplaw.net
*(pro hac vice)*


### CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of August 2016, I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system, and notice will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.


*By: /s/ Christopher Johnsen*
Christopher Johnsen